IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DANIEL DOYLE and ANNE DOYLE, | ) | |
| | ) | 8:05CV21 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | FINDINGS OF FACT |
| | ) | AND |
| LELAND GRASKE, | ) | CONCLUSIONS OF LAW |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court for resolution after a trial to the court from March 31, 2008 to April 8, 2008. This is an action in admiralty for damages for personal injuries in connection with a boating accident that occurred in Grand Cayman Island on October 31, 2003. Plaintiffs allege negligence by defendant Leland Graske in the operation of the boat. This is a trial to the court.

**I.      Findings of Fact**

**A.      The Accident**

The evidence adduced at trial establishes the following. The Doyle and Graske families are longtime friends. In October of 2003, Daniel Doyle and his wife, Anne, visited Graske and his wife, Leslie, at the Graske's condominium in the Cayman Islands.

Leland Graske owns a 14-foot Caribe inflatable boat for recreational purposes in the Cayman Islands. *See* Trial Exhibit ("Tr. Ex.") 1, replica drawing of a Caribe 14-foot boat; Tr. Exs. 2-15, photographs of boat. The boat has seating for six people and is rated for a float capacity of six adults. Tr. Ex. 2-15, 205, photographs of boat; Tr. Ex. 18, Caribe owner's manual, and testimony of Leland Graske. In the boat, there is forward-facing seating for two aft, two midship, and rear-facing seating for two on a cushion in the bow. *Id.* The bow cushion seating is approximately four to five inches below the top of the

inflated sides (gunnel) of the boat.[1]  Tr. Ex. 221, photograph.  The aft and midship seats are angled down from front to aft.  Tr. Exs. 209, 211, photographs.  The bow seat is flat. Tr. Ex. 221, photograph.  All the seats measured from the top of the seat cushion are approximately 16" above the deck (the bow seat being 13.5").   Tr. Exs. 211, 216, photographs.  The aft seat has a back rest.  Tr. Ex. 219, photograph.  The midship seat has a back rest for the starboard side only. Tr. Ex. 220, photograph.  The bow seat has no back rest, but it does have a back stop of approximately 5 inches.  Tr. Ex. 221, photograph. There are gunnel hand-hold straps (hand straps) for the midship and bow passengers.  Tr. Exs. 206, 289, photographs.  The boat was equipped with an outboard 70-horsepower two-cycle engine manufactured by Yamaha.  Tr. Ex. 207.  A 70-horsepower engine is the maximum horsepower engine approved for use on the craft.  Tr. Ex. 18, Caribe owner's manual at 4.

The evidence adduced at trial shows that the boat had been repaired by a local mechanic employed by Kirk Marine a few days before the accident that is the subject of this action.  Leland Graske testified that the steering mechanism had been frozen.  In the repair, Kirk Marine reported that its mechanic had disassembled and lubricated the steering mechanism.  The engine had been used for approximately two hours in the time between the repair and the accident.  During those two hours the engine was used at idle or low rpms to travel close to shore.

Leland Graske testified that he has been a boat owner and operator for most of his adult life.  Doyle had limited experience as a boat owner and operator.  He owned a boat for use on the Missouri River for several seasons and he also owned a small fishing boat

---

[1]A gunnel is the outer side or hull of the boat.  In this case the tube is the gunnel.  *See* Testimony of Herbert Angell.

that he used infrequently.  Graske also testified that he believes that Daniel Doyle is an above-average risk-taker.  He would rate Doyle's risk-taking as 8 on a scale of 1 -10, ten being the highest.

The testimony at trial establishes that on October 31, 2004, at approximately 10:30 a.m., Daniel Doyle, Leland Graske and Graske's friend, Robert (Bobby) Van Hook went fishing in Graske's Caribe inflatable boat.  Graske testified that he swam to the boat's mooring and brought the boat back to shore, where Doyle and Van Hook boarded the boat with a cooler, a fishing tackle box, and fishing rods.  No one was wearing a life jacket. There is considerable disagreement in the testimony with regard to the seating of the passengers in the boat.

Doyle testified that he has little or no recollection of the event.  Leland Graske testified that he was driving the boat and was standing or sitting behind the midship starboard side steering panel, which rises above the boat's gunnel level and has a wind screen.[2]  Graske testified that he recalls Van Hook sitting in the midship starboard side seat holding a diagonal hand strap located on the inside of the port inflatable tube.  Graske consistently maintains that Daniel Doyle was seated on the starboard inflated tube, holding at least one hand strap and with his feet between the midship seat and the bow cushion seat.  He testified that he does not believe Doyle changed position until he was ejected from the boat.

Bobby Van Hook testified that he was seated on the port side of the midship seat, the fishing equipment was on the starboard side and the tackle box and cooler were on the deck in front of the midship seat.  He stated that the fishing rods were propped between

---

[2]Starboard is the right side of the boat when facing forward to the bow of the boat and port is the left side of the boat.  *See* Testimony of Herbert Angell.

the bow and the midship seating area, slanting upward toward the stern, on the starboard side.  (Tr. Ex. 1).  He testified that Graske was seated, not standing, behind the steering wheel.  Van Hook also testified that he believes Doyle was initially seated on the port side inflated tube, toward the bow, adjacent to or above the bow seat.  Van Hook testified that as the boat accelerated, Doyle moved to a fully-seated position in the bow seat on the port side of the seat.  It was from this position that the plaintiff was ejected from the boat.  He does not recall Doyle holding any hand straps.

Graske testified that after the occupants were on board, he steered the boat, at idle speed, through the no-wake zone.  He testified that he announced to the passengers that the boat was about to accelerate by saying words to the effect "Here we go."  He then increased speed to put the boat on plane.[3]  The boat came on plane and, as the defendant was adjusting the trim, the steering linkage disengaged.  The motor swung violently clockwise causing the boat to turn hard to the port side.

Doyle was ejected from the boat over the starboard side.  The underside of the boat struck him on the right side of his back and the back of his head.  Graske testified that he immediately put the boat in neutral or killed the motor.   He and Van Hook located Doyle in the water.  Graske was able to steer the boat by holding the engine's drag link in one hand and the throttle in the other.  Doyle was hurt, but coherent.  He apparently did not lose consciousness, nor was he bleeding.  Graske and Van Hook brought Doyle back to shore.  Once on shore, they helped him walk to the edge of the beach.  They called an ambulance which took him to the Cayman Islands Health Services Authority Hospital in Georgetown, Grand Cayman ("Georgetown Hospital").

---

[3]"On plane" means that the boat is going fast enough that the hull of the boat is skimming along the top of the water rather than displacing the water.  *See* Testimony of Herbert Angell.

### B.   The Medical Evidence

At Georgetown Hospital, the emergency room staff diagnosed Doyle with fractures of multiple right posterior ribs, a right flail chest,[4] a right hemothorax, a right pnuemothorax, right posterior chest surgical emphysema, and multiple minor lacerations to his posterior skull, right arm and right shoulder. *See* Tr. Ex. 37, Georgetown Hospital medical records at 1-2, 36. On admission, Doyle had no adverse neurologic signs or symptoms. *Id.* at 2, 36-37.

Doyle was treated with insertion of a chest tube and transferred to intensive care. *Id.* at 3-5. On the third day of his hospital stay, November 2, 2003, at 4:15 p.m., Georgetown hospital staff witnessed a cardiopulmonary arrest. *Id.* at 49. Cardiopulmonary resuscitation was initiated immediately and the code team arrived within five minutes. *Id.* Doyle was intubated and was placed on a ventilator by 4:30 P.M. *Id.* Thereafter, the plaintiff was sedated, medically paralyzed and kept on a ventilator. *Id.* at 27-29. On November 4, 2003, a chest x-ray showed bilateral changes consistent with acute respiratory distress syndrome. *Id.* at 32-33. Later that day, Doyle was transported by air to the United States for treatment. *Id.* at 34-35. Originally, Doyle was to have been transferred directly to University of Nebraska Medical Center ("UNMC") in Omaha, Nebraska, but, because the respirator in the air ambulance was malfunctioning, Doyle was instead transported, along with Georgetown Hospital's ventilator, to Memorial Regional Hospital in Hollywood, Florida ("Hollywood Hospital"). *Id.* at 35; Tr. Ex. 38, Hollywood Hospital medical records.

---

[4]A flail chest describes a chest cavity in which the ribs do not provide enough rigid support for effective inspiration.

Doyle was admitted in critical condition to the Hollywood Hospital at 2:37 a.m. on November 5, 2003.  Tr. Ex. 38, Hollywood Hospital records at 60.  On admission, his injuries were noted to be "a flail chest involving the right hemithorax with multi rib fractures, essentially involving the entire right hemithorax."[5]  *Id.* at 24.  He was diagnosed with fractures of all eleven right posterior ribs and his right scapula.[6]  *Id.* at 25-27.  Diagnostic tests also showed underlying pleural effusion and a minimal anterior pnuemothorax.[7]  *Id.* at 28.  On November 7, a tracheostomy was performed to provide a permanent airway for his continued ventilation.[8]  *Id.* at 3, 62.  A gastrostomy feeding tube ("G-tube") was also surgically placed that day.  *Id.* at 3.  Doyle later developed respiratory insufficiency and was transported to UNMC on November 14, 2003.  *Id.*

Doyle was admitted to UNMC at 9:46 p.m. on November 14, 2003.  Tr. Ex. 39, UNMC records at 37.  Doyle's attending physician at UNMC was Dr. Joseph C. Stothert, M.D., Ph.D., the Medical Director for Trauma at UNMC, a surgeon and a Ph.D. Pulmonary Physiologist.  Tr. Ex. 79, Stothert curriculum vitae; Tr. Ex. 39, UNMC records at 6.  He was discharged on November 19, 2003.  Tr. Ex. 39, UNMC records at 38.  It was noted in

---

[5]A hemithorax is one side of the thorax, which is "[t]he upper part of the trunk between the neck and the abdomen; it is formed by the 12 thoracic vertebrae, the 12 pairs of ribs, the sternum, and the muscles and fasciae attached to these; below, it is separated from the abdomen by the diaphragm; it contains the chief organs of the circulatory and respiratory systems."  Stedman's Medical Dictionary (27th ed. 1994) (available on Westlaw at Stedmans 177000 & 408370).

[6]The scapula is "[a] large triangular flattened bone lying over the ribs, posteriorly on either side, articulating laterally with the clavicle at the acromioclavicular joint and the humerus at the glenohumeral joint. It forms a functional articulation with the chest wall, the scapulothoracic articulation."  Stedman's Medical Dictionary (27th ed. 1994) (available on Westlaw at Stedmans 364860).

[7]A pleural effusion is increased fluid in the pleural space. Stedman's Medical Dictionary (27th ed. 1994) (available on Westlaw at Stedmans 125240).  The pleura is the serous membrane enveloping the lungs and lining the walls of the pleural cavity.  *Id.* at 321290.  A pnuemothorax is the presence of free air or gas in the pleural cavity.  *Id.* at 323250.  External compression of the lung by a pneumothorax or pleural effusion can lead to a pulmonary collapse.  *Id.* at 85710.

[8]A tracheostomy is an operation to make an opening in the trachea.  Stedman's Medical Dictionary (27th ed. 1994) (available on Westlaw at Stedmans 414210).

Doyle's discharge summary that he had been admitted on a ventilator, had a feeding tube in place, and had suffered a closed head injury that left him confused and agitated at times. *Id.* at 37. During his hospitalization, Doyle was weaned from the ventilator and his condition improved to allow him to eat some regular food. *Id.* At the time of his discharge, he was able to speak well and to recognize family and friends. *Id.* Doyle received occupational and physical therapy consultations for ambulation, strength, and to learn how to perform the activities of daily living. *Id.* He was assessed for inpatient rehabilitation by a physical medicine and rehabilitation specialist, Dr. Jason Schave. *Id.* at 40. Dr. Schave diagnosed Doyle with anoxic encephalopathy with coordination difficulties and confusion, impaired activities of daily living and mobility, dysphagia,[9] and agitated behavior. *Id.* Doyle was referred to Methodist Hospital Acute Rehabilitation Center ("Methodist Acute Rehab") for inpatient rehabilitation. *Id.* at 37.

Doyle underwent a long course of physical and neurological rehabilitation. Tr. Ex. 40, Methodist Acute Rehab medical records at 14. He was hospitalized at Methodist Acute Rehab from November 19, 2003, to December 5, 2003, for medical care and occupational and physical therapy as part of a comprehensive brain injury rehabilitation program. *Id.* Doyle's treating physician there was Dr. Jude Cook, M.D., an internist and physical medicine and rehabilitation specialist (also referred to as a physiatrist). *Id.* at 10; Tr. Ex. 107, Cook curriculum vitae.

At the time of his admission, Doyle had right rib fractures, a right clavicle fracture, a right scapular fracture, a G-tube placed, a tracheostomy, he was agitated and had symptoms of dysphagia. Tr. Ex. 104, Trial Deposition of Jude Cook, M.D. ("Cook Dep.")

---

[9]Dysphagia is difficulty swallowing. Stedman's Medical Dictionary (27th ed. 1994) (available on Westlaw at Stedmans 122190).

at 33.  Dr. Cook diagnosed traumatic brain injury and anoxic encephalopathy.[10]  *Id.* at 34.
A neurological examination revealed a brain injury rated level IV on the Rancho Los
Amigos scale, a scale that helps medical professionals determine a person's level of
impairment secondary to brain injury.[11]  *Id.* at 6.  A person with a Rancho level IV brain
injury demonstrates poor memory, insight and judgment, lack of awareness of his physical
ailments and environment and agitation.  *Id.* at 11.  Dr. Cook did not diagnose Doyle with
depression, but testified that people in a Rancho level IV of brain injury often lack the
awareness of their environment or personal health that would lead them to be depressed.
*Id.* at 11.  Dr. Cook also found that Doyle's cerebellar functioning, which relates to fine
motor control and coordination, was slow but intact.  *Id.* at 13.  Dr. Cook established goals
of brain injury recovery, education of the patient and his family regarding brain injury
issues, improving Doyle's mobility to a standby assist level, improving his activities of daily
living and his swallowing to an ultimate goal of removal of his tracheostomy.  *Id.* at 14-15.

During the term of the hospitalization, Doyle's rib fractures resolved, his ability to
swallow improved, and his tracheostomy was removed.  Tr. Ex. 40,  Methodist Acute
Rehab medical records at 14.  Dr. Cook's discharge summary notes that during the
hospitalization Doyle's cognition slowly improved from a Rancho level IV to a near Rancho
level VI at the time of his discharge.[12]  *Id.*  Significantly however, Doyle still had a

---

[10]Encephalopathy is any disorder of the brain.  Stedman's Medical Dictionary (27th ed. 1994)
(available on Westlaw at Stedmans 129640).  Anoxia is absence or almost complete absence of oxygen from
inspired gases, arterial blood, or tissues.  *Id.* at 24700.

[11]*See also* Rancho Los Amigos National Rehabilitation Center website ("Rancho Los Amigos
website"), http//www.rancho.org/patient_education/cognitive_levels.pdf

[12]Rancho level VI is labeled "Confused-Appropriate."  At that level, "a patient shows goal-directed
behavior, but relies on cueing for direction.  He can relearn old skills such as activities of daily living, but
memory problems interfere with new learning. He has a beginning awareness of self and others."  *See* Rancho
Los Amigos website, http//www.rancho.org/research_pted.htm

gastronomy tube, mild agitation and reactive depression secondary to his head injury. *Id.* at 13.

Doyle was followed on an outpatient basis by Dr. Cook. Tr. Ex. 104, Cook Dep. at 25. In May 2004, Dr. Cook reported slow improvement. *Id.* Cook examined Doyle again in November 2004, and noted that test results were consistent with a moderate to severe brain injury. Cook Dep. at 29. When Doyle was last seen by Dr. Cook in May 2006, he was neurologically the same as he had been in the previous examination, but continued to be depressed. *Id.* at 42. Based on Dr. Cook's examination of Daniel Doyle, Doyle's history and Dr. Cook's collaborative consultations with other physicians and health providers, Dr. Cook testified that he believed to a reasonable degree of medical certainty that Daniel Doyle is permanently disabled and unemployable. *Id.* at 30-31.

After his release from Methodist Acute Rehab, Doyle was referred to Dr. Richard L. Bowles, Psy.D., a rehabilitation neuropsychologist, for testing to determine the extent of impairment from the brain injury. *Id.* at 18-19; Tr. Ex. 42, Neuropsychological Evaluation dated March 1, 2004 ("Bowles first report") at 1; Tr. Ex. 67, Deposition of Richard L. Bowles, Psy.D., ("Bowles Dep.") at 5. Dr. Bowles diagnosed dementia secondary to acquired brain injury and depressive reaction by history. Tr. Exs. 42, Bowles first report at 7; 104, Cook Dep. at 19; Bowles Dep. at 38. Dr. Bowles reported considerable impairment in numerous cognitive areas including attention/concentration, processing speed, memory and executive functioning and problem solving. Tr. Ex. 104, Cook Dep. at 23; Tr. Ex. 42, Bowles first report at 6. Test results indicated a moderately severe degree of overall impairment. Tr. Ex. 42, Bowles 2004 Report at 7. Bowles recommended 24-hour supervision. *Id.* At the time of the first exam, Dr. Bowles expected Doyle to recover further over the following several months to a year. *Id.* Dr. Bowles reexamined

Doyle in July 2004.  Tr. Ex. 43, Neuropsychological Evaluation dated March 1, 2004 ("Bowles second report") at 2.  The second neuropsychological examination showed a moderate to severe brain injury.  *Id.* at 6.  Test results were generally consistent with those obtained in the earlier testing, but there were significant declines in some areas.  *Id.* at 4, 6.  Doyle continued to exhibit deficits in short term memory, basic and complex attention as well as decreased vigilance and slowed processing of information.  *Id.* at 6.  Given Doyle's relative lack of progress, Dr. Bowles was concerned about the prognosis for recovery of cognitive function.  *Id.*

Doyle's last neuropsychological evaluation was performed by Dr. Bowles in 2005. Tr. Ex. 44, Neuropsychological Evaluation dated June 23, 2005 ("Bowles third report") at 2.  Doyle's scores on various tests reflected little change from his 2004 testing.  *Id.* at 7. Dr. Bowles found Doyle's status to be incompatible with the ability to operate a motor vehicle safely.  *Id.*  Dr. Bowles testified by deposition that Doyle's physical condition is at its maximum improvement.  Tr. Ex. 67, Bowles Dep. at 50-52.  Dr. Bowles stated that Doyle's psychological condition may be improved with different therapies, but it too is static.  *Id.*

At present, the record shows that, although he is within the average range of global intellectual functioning, Doyle has deficits in verbal and visual short-term memory, concentration and complex attention, processing word speed and categorical fluency as well as diminished motor speed and coordination in both hands.  Tr. Ex. 44, Bowles third report at 7.  He has little motivation, questionable judgment and lacks awareness of safety. *Id.*  Doyle continues to need ongoing supervision as a result of the questionable reliability of his judgment and his lack of awareness of safety-related issues.  *Id.*  His signs and symptoms are consistent with a moderate to severe brain injury.  *Id.*  Dr. Bowles also

stated that Doyle's status was not compatible with the ability to operate a motor vehicle safely.  *Id.*  Dr. Bowles reports that he expects Doyle's cognitive status to remain stable into the future, barring a stroke or other brain injury.  *Id.* at 7.

On his treating physician's recommendation, Doyle received outpatient therapeutic services from Quality Living, Inc.,  in Omaha from 8/2004 to 3/2005.  Quality Living records show that he did not make much progress there with the therapy.  Tr. Ex. 41, Quality Living, Inc.'s medical records at 21.  Other records show that Doyle's cognitive level improved from a Rancho level IV (confused and agitated) to a level VI (confused and appropriate).  Tr. Ex. 46, Giiter records at 7; *see* also Rancho Los Amigos website, http//www.rancho.org/patient_education/cognitive_levels.pdf. [13]

At the present time, Doyle is being treated by his family physician, an internist, Dr. Michael F. Giiter.  Tr. Ex. 46, Giiter medical records.  Dr. Giiter's notes indicate that Doyle has diagnoses of reactive depression and decreased mental status secondary to brain injury.  *Id.* at 49.  Doyle is also being treated by a psychiatrist, Dr. Rodney L. Nitcher, D.O., Tr. Ex. 45, Nitcher medical records.  Dr. Nitcher has expressed the opinion that Doyle's psychiatric condition is chronic and that Doyle needs 24-hour supervision and cannot live alone.  Tr. Ex. 288, Allison questionnaires at 3; Tr. Ex. 24, Allison Supplemental Life Care Plan at 2.

All of Doyle's treating physicians agree that he is permanently and totally disabled. Dr. Cook testified to his opinion that Doyle suffered a traumatic brain injury from his boating accident as well as an anoxic encephalopathy due to subsequent events.  Tr. Ex. 104, Cook Dep. at 35.   All of the doctors agree that his condition relates to an injury sustained

---

[13]Rancho level VII is theoretically the highest level a thinking-impaired patient can achieve short of full recovery.  *See* Rancho Los Amigos website, http//www.rancho.org.

as a result of the boating accident described above. *See* Tr. Ex. 78, Report of Dr. Joseph C. Stothert at 1 (noting "the original injury on October 31, 2003 caused a deterioration in Mr. Doyle's respiratory status leading to an anoxic event" and "the injury to his chest and subsequent events caused the brain injury that Mr. Doyle currently suffers from").  The physicians further agree that it is unlikely Doyle sustained the closed head injury at the time of accident, but is more likely that he had an anoxic hypoxic event during his hospital treatment for the injuries he sustained during the boating accident.[14]  Tr. Ex. 104, Cook Dep. at 34.  No doctor is of the opinion that the anoxic hypoxic event is unrelated to the boating accident.

### C.    Duty of Care

At trial, the plaintiffs presented the testimony of Herbert Charles Angell, Nebraska State Boating Law Administrator, with respect to the duty or standard of care for the operator of a boat.  *See also* Tr. Ex. 58, Herbert Angell curriculum vitae.  Angell testified that he has investigated more than a thousand boating accidents.  He reviewed several boating safety publications.  *See* Tr. Ex. 89, United States Coast Guard ("USCG") inland rules for navigation; Tr. Ex. 92, 2007 Nebraska boating guide.  He stated that his review of the evidence in this case led him to conclude that Doyle had been seated on the top of the tube, or gunnel, on the starboard side toward the bow.  He testified that, in his opinion, Graske should not have allowed Doyle to sit on the starboard right gunnel or tube and that to have done so violated safe boating practices.  He testified that even if Doyle had been seated in the bow seating area at the front of the boat, facing backward, Graske's

---

[14]Anoxia is absence or almost complete absence of oxygen from inspired gases, arterial blood, or tissues.  It is to be differentiated from hypoxia, which is a decrease below normal levels of oxygen in inspired gases, arterial blood, or tissue, short of anoxia.  Stedman's Medical Dictionary (27th ed. 2000) at [on Westlaw] Stedmans 24700 & 196860

operation of the boat would have been unsafe and "negligent."  He testified, assuming that Van Hook's version of events were true, that Doyle was at first seated on the tube, but sometime in the period of time between the boat's proceeding at no-wake speed and coming up on plane, Doyle assumed a position on the bow seat and was told by both Van Hook and Graske to hold on, but did not do so, it would have been an unsafe boating practice for Graske to proceed.  Angell also testified that at planing speed the only safe seating for anyone other than the operator would be in the middle seat facing forward.  He stated that the distance between the cushioned area and the top of the tube would not provide an adequate backrest to allow safe seating in the bow cushion seating area.

Michael Sampsel, a mechanical and marine engineer, also testified as an expert witness on behalf of the plaintiffs.  He testified that based on the evidence he had reviewed, the hull planing speed of a boat similar to Graske's is estimated to be less than 30 MPH.  He further testified that the cushion on the bow of the boat—on which Van Hook claims Daniel Doyle was seated—is not designed to be a seat when the boat is "underway," or going faster than a fast idle.

Paul J. Larson, a marine accident investigator, marine surveyor, consultant and retired Commander in the USCG, testified that he also investigated the accident.  Tr. Ex. 54, Larson curriculum vitae.  He reviewed the deposition testimony in this case as well as various boating safety regulations, guides and statistics.  *See* Tr. Ex. 87, USCG requirements for recreational boats; Tr. Ex. 88, USCG boating statistics; Tr. Ex. 93, California Boating Law; Tr. Ex. 94, Federal Safety Tips.  Based on his knowledge and investigation of this and numerous other "fall overboard" type accidents, he testified that, in his opinion, it was "negligent" for Graske to have allowed Doyle to sit on the tube of the boat.  He testified that the operator of a boat is responsible for all aspects of safe operation

of the vessel.  In his opinion, a sudden mechanical failure caused the accident, but the unsafe boating by Graske in allowing Doyle to remain seated on the tube while the boat was underway was the cause of Doyle's fall overboard.  Also, he testified that a shipowner has a nondelegable duty to maintain a ship in a seaworthy condition.  Larson also testified that if a passenger were sitting on the tube of the boat, holding the hand straps would not have prevented ejection from the boat.  He further testified that, even if the testimony of Bobby Van Hook were credited and Doyle moved from the tube to the bow cushion seat after the vessel was underway and was warned to hold a hand strap, but did not, Graske's operation of the boat would have been in violation of safe boating practices.  Larson also stated that the bow cushion area would not have been a safe seat while the boat was underway at planing speeds.

The defendant's expert, Robert MacNeill, a naval architect, human factors engineer and Coast Guard Licensed Captain, also testified at the trial.  Tr. Ex. 261, Robert MacNeill curriculum vitae.  He testified that he has investigated or reviewed investigations of hundreds of boating accidents in connection with consulting provided to the Coast Guard with respect to the implementation of the federal boat safety act.  He further stated that in preparation for testimony in this case he physically inspected and operated Leland Graske's inflatable boat.  Tr. Ex. 202-227, photographs of boat, Tr. Ex. 260, Supplemental Report of Robert MacNeill (received for limited purpose of measurements).  He testified that, in his opinion, there are occasions when it would be safe to allow a passenger to sit on the tube of an inflatable boat.  With respect to a duty of pre-trip inspection by a boat operator, he stated that it would be sufficient for the operator to make sure that the boat was operational.  He also testified that, in his opinion, any passenger who was seated in the front of the boat and was not holding on to a hand strap would have been thrown out

14

of the boat in a sudden turn.  He also testified that he knew of no rules, regulations, or standards that would require a boat operator to insist that a passenger hold a handhold.

### D.    Damages

Daniel Doyle's wife, Anne, and his children also testified at the trial.  They testified with respect to Doyle's abilities and disabilities and to differences in his personality since the accident.  Anne Doyle also testified to the differences to her life and to the Doyles' marriage since the accident.

The parties have stipulated that the Doyles have incurred medical bills to date in the amount of $252,517.  Filing No. 295, Ex. A, Stipulation, Tr. Ex. 22, Summary of Medical Bills.  The evidence shows that prior to the accident, Daniel Doyle was employed as a mechanical engineer earning between $52,692 and $57,301 per year for the years 1999 to 2002.  Tr. Exs. 81-85, Income Tax Returns, 1999-2003.  He would have been expected to continue working until he reached age 66, his Social Security full retirement age.  Tr. Ex. 255, John Scarborough Supplemental Economic Loss Analysis at 2.  There is no evidence that he would have been inclined to retire any earlier.

Both parties submitted evidence on the cost of providing medical and supportive care to Doyle in the future.  According to life expectancy tables, Doyle would be expected to live to age 79.  Tr. Ex. 80, Standard Ordinary Mortality Table; Tr. Ex. 25, Report of Kent Jayne at 8.  The plaintiffs' expert, Kathie Allison, a certified life care planner, presented three alternative life care plan scenarios.  Tr. Ex. 23, Allison Life Care Plan; Tr. Ex. 24, Supplement to Life Care Plan.  Option I would provide additional assistance for Doyle to remain in his home, such as help with home maintenance and cleaning, as well as a household attendant for 111.6 hours per week, and would cost $66,811 to $67,051 annually, in today's dollars.  Tr. Ex. 23 at 10; 24 at 4.  Option II would provide for live-in

care for Doyle and would cost between $102,500 and $109,500 annually, at the rate for care of $280 to $300 per day.  *Id.*  Option III would provide supportive living at a facility designed for brain-injured people, such as Quality Living, Inc., and would cost $82,125 annually.  *Id.*  Under each option, Ms. Allison's life care plan would also include additional sums for physicians' visits, medication and supplies, physical and occupational therapy, equipment, and mileage, at an approximate cost of between $2,434 and $3,049 per year.  *Id.* at 4.  Ms. Allison estimates the lifetime cost for Doyle's care under Option I  would be $1,830,876 to $1,866,462; under Option II  would be $2,765,834 to $2,978,611; and under Option III  would be $2,232,140 to $2,261,386 in today's dollars.  *Id.*

William H. Burke, Ph.D., a certified rehabilitation counselor and Board-certified disability analyst and rehabilitation consultant, testified on behalf of the defendant.  Tr. Ex. 258, William Burke, Ph.D. curriculum vitae.  He stated that he had reviewed Doyle's medical records, physicians' recommendations, Ms. Allison's life care plan and the depositions and testimony in this case.  He concluded that Daniel Doyle has a combination of cognitive and higher cognitive deficits that interfere with his ability to live independently.  He agreed that Doyle needs someone available for round-the-clock care.  He also presented several options for Doyle's continued care.  Tr. Ex. 257.  Each included costs for medical care, equipment and medication.

 Dr. Burke's first option for Doyle's supportive care is based on the assumption that Mrs. Doyle would continue to care for Daniel Doyle in his home and that she preferred to do so.  *Id.* at 13.  Dr. Burke testified that this option contemplates the utilization of a community living coach for 40 hours per week to enable Doyle to perform work-type activities in the community.  Dr. Burke estimated that the community living coach services could be provided for $23,712 per year.  *Id.* at 15.

16

Option II assumes that Mrs. Doyle would not be available and would provide Doyle with a live-in personal care attendant and homemaker along with household production assistance and case management to replace those services provided by his wife. *Id.* Dr. Burke estimated that the services of a live-in personal care attendant could be obtained for approximately $50,219 per year, including room and board. *Id.* at 16.

Option III provides for placement of Doyle in an assisted-living facility. Dr. Burke estimated that this option would cost between $28,416 and $49,320 per year. Dr. Burke's calculations do not include any compensation for Mrs. Doyle or other family members in caring for Doyle. Dr. Burke testified that he envisioned the assisted-living option to be utilized when Doyle was elderly.

The plaintiffs' economic expert witness, Kent Jayne, M.A., M.B.A., a vocational Economic Consultant and Rehabilitation economics specialist, calculated the value of Doyle's lost earnings as of July 2007 to be $152,826. *See* Tr. Ex. 25, Report of Kent Jayne at 8; Tr. Ex. 61, Kent Jayne curriculum vitae. He calculated that the present value of Doyle's diminished earning capacity from July 1, 2007 to his retirement age of 66 is $817,112. *Id.* The defendant's economic expert, John Scarbrough, Ph.D., calculated Doyle's lost future wages according to a worklife expectancy of 12.6 years from the age of 49, to account for the likelihood that Doyle would not live to the age of 66, or would have been out of the workforce at times. Tr. Ex. 255, Scarbrough Supplemental Report at 4. He also factored the projected cost of health insurance and retirement benefits into his future earnings analysis and also calculated the present value of Doyle's lost earnings before and after a deduction of Doyle's Social Security disability benefits. *Id.* Dr. Scarbrough's analysis resulted in a total net economic loss for past and future wages in the

17

amount of $886,696 (present value), if disability payments were deducted, and of $1,059,785, without the deduction of disability payments.

Dr. Scarbrough also analyzed the future cost of medical care and supported living for Doyle and calculated present value under both Ms. Allison's Life Care Plan and the plan proposed by Dr. Burke.  Tr. Ex. 255, Scarbrough Supplemental Report at 4.  According to Dr. Scarbrough's analysis, the present value of the future costs of Doyle's care under Ms. Allison's Option I (household attendant) would be $1,580,750.  *Id.* at 21, Table A.2 for Option I.  The present value of the future costs of Doyle's care under Ms. Allison's Option II (live in care)  would be $2,449,476.  *Id.* at 22, Table A.2 for Option II.  The present value of the future costs of Doyle's care under Ms. Allison's Option III (supported living)  would be $1,919,934.  *Id.* at 23, Table A.2 for Option III.  Under the scenarios presented by defendant's expert, Dr. Burke, the present value of the future costs of Doyle's care under Option I (wife available) would be $656,762.  *Id.* at 30, Table A.4 for Option I.  The present value of the future costs of Doyle's care under Option II (wife not available - home care) would be $1,285,272.  *Id.* at 31, Table A.4 for Option II.  The present value of the future costs of Doyle's care under Option III (wife not available - facility care)  would be $930,691. *Id.* at 32, Table A.4 for Option III.

## II.    Conclusions of Law

### A.    Law

This action arises under the admiralty and maritime jurisdiction of this court pursuant to 28 U.S.C. § 1333.  General maritime law governs a tort claim when conditions of location and connection to maritime activity are satisfied.  *Sisson v. Ruby,* 497 U.S. 358, 369 (1990).  The general tort concepts of negligence and proximate cause apply in admiralty and maritime cases.  *Phillips Petroleum Co. v. Stokes Oil Co.,* 863 F.2d 1250, 1255 (6th

Cir. 1988).  In tort actions, courts look to the Restatement (Second) of Torts as a source of general common law principles to determine general maritime law.  *See Wells v. Liddy,* 186 F.3d 505, 525 (4th Cir. 1999); *Wallis v. Princess Cruises, Inc.,* 306 F.3d 827, 841 (9th Cir. 2002).

In order to succeed on a claim of negligence under maritime law, a plaintiff must establish all elements of a negligence cause of action in admiralty, which are essentially the same as land-based negligence under the common law:  1) the existence of a duty of care owed by the defendant to the plaintiff; 2) the breach of that duty of care; 3) a causal connection between the offending conduct and the resulting injury, which is called "proximate cause"; and 4) actual loss, injury or damage suffered by the plaintiff.  *Pearce v. United States*, 261 F.3d 643, 647-48 (6th Cir. 2001); *Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 Fed. Appx. 914, 919 (6th Cir. 2004).  The duty of care can be derived from "duly enacted laws, regulations, and rules; . . . custom . . . or . . . the dictates of reasonableness and prudence."  *Galentine v. Estate of Stekervetz*, 273 F. Supp. 2d 538, 544 (D. Del. 2003).

As a general rule, a shipowner owes to a person lawfully aboard the vessel "the duty of exercising ordinary care, which is held to mean reasonable care under the circumstances of each case."  *Urian v. Milstead*, 473 F.2d 948, 951 (8th Cir. 1973); *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 632 (1959).  Under that standard, the degree of care required must be in proportion to the apparent risk.  *Muratore v. M/S Scotia Prince*, 845 F.2d 347, 353 (1st Cir. 1988).  In other words, under certain situations, reasonable care may be a very high degree of care and in another situation it may be less.  *Smith v. Southern Gulf Marine Co. No. 2, Inc.*, 791 F.2d 416, 421 (5th Cir. 1986).  The "extent to which the circumstances surrounding maritime travel are different

from those encountered in daily life and involve more danger to a passenger, will determine how high a degree of care is reasonable in each case." *Mendelson v. Delaware River & Bay Authority*, 112 F. Supp. 2d 386 (D. Del. 2000).

Admiralty law also adheres to principles of comparative fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 409 (1975); *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 221 (1994). Accordingly, proportional division of liability applies in admiralty cases. *See, e.g., Phillips Petroleum Co. v. Stokes Oil Co., Inc.*, 863 F.2d 1250, 1255 (6th Cir. 1988) ("Damages in admiralty cases are generally allocated among tortfeasors based on comparative fault."). Under the maritime rule, the plaintiff's comparative negligence mitigates his damages. *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 208 (1st Cir. 1988).

Admiralty law imposes joint and several liability on tortfeasors. *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 273 n.30 (1979) (stating that "the general rule is that a person whose negligence is a substantial factor in the plaintiff's indivisible injury is entirely liable even if other factors concurred in causing the injury"). Where joint and several liability is imposed, "[n]ormally, the chosen tortfeasor may seek contribution from another concurrent tortfeasor." *Id.*; *see also McDermott, Inc. v. AmClyde*, 511 U.S. at 210 n.10 (noting that comparative negligence and joint and several liability are not incompatible). Joint and several liability allows a plaintiff to recover from one of multiple defendants, when plaintiff's recovery from other tortfeasors is limited by outside facts, such as a defendant's insolvency, making other defendants, rather than the innocent plaintiff, responsible for the shortfall. *McDermott*, 511 U.S. at 210 n.10. Although the damages assignable to the plaintiff's own culpability must be subtracted from whatever damages the plaintiff has proven at trial, the defendant would still be liable "in full for the

20

remainder," even where a third-party's negligence contributed to the injuries. *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. at 260.

Joint and several liability applies "where there has been a judgment against multiple defendants," whereas, in admiralty law, a defendant may be liable for the proportion of fault assignable to another culpable party who was not named as a defendant. *See Id.* (*quoting McDermott, Inc. v. AmClyde*, 511 U.S. at 221).

### B.  Analysis

#### 1.  Duty/Breach of Duty

In making these findings the court generally credits the testimony of Doyle's treating physicians and plaintiffs' experts Angell, Larson, Sampsel, and Allison.  The court also generally agrees with the opinions of the defendant's life care expert Burke.  The court generally agrees with both expert economists Jayne and Scarbrough.  For reasons discussed below, the court is not inclined to fully credit the testimony of defendant's expert MacNeill.

The court finds that the evidence establishes that a  boat owner and operator has an undisputed responsibility for the passengers' safety and the safe operation of the boat.  The court credits the testimony of Angell and Dr. Larson, supported by the boating safety regulations and guidelines admitted into evidence, that it is an unsafe boating practice to operate a vessel with a passenger seated on the gunnel or tube of the boat.  The court finds that defendant Graske's conduct in the operation of the boat violated a boat operator's duty to use reasonable care under the circumstances.  Significantly, the circumstances in this case involve a small boat outside the no wake zone in the ocean accelerating to bring the boat on plane.

The court finds that the totality of the evidence shows that Doyle was seated on the tube as the boat proceeded through the no wake zone. It is plausible that Doyle may have moved to the bow seating area as the boat accelerated, but whether he did so or not does not affect the court's analysis. The court finds that Graske did not use reasonable care for the safety of his passengers under the circumstances in either event. The evidence establishes that both the tube and the bow cushion seat are positions of danger while accelerating a small watercraft on the open ocean. Similarly, whether or not Doyle was told by either Graske or Van Hook to "hold on," and disregarded the admonition, makes no difference to the court's analysis. If Doyle had disregarded such a command, it would have then been negligent for Graske to continue to accelerate knowing that Doyle was not holding the hand straps.

Graske had a duty of reasonable care under the circumstances for the safety of his passengers and the safe operation of his boat. The evidence shows that it is an unsafe boating practice to accelerate up to plane with a passenger in a position of danger. Under these circumstances, a boat operator using reasonable care would ensure that his passengers were seated in a safe position in the boat while accelerating. Graske, an experience boater, knew or should have known that his passenger was in a place of danger as long as Doyle was in the bow section of the boat and the boat was traveling at a speed sufficient to bring it on plane.

Daniel Doyle, as a passenger somewhat familiar with boating, also had a duty to use reasonable care for his own safety. The evidence shows that Daniel Doyle put himself in a place of danger and knew or should have known that it was an unsafe boating practice to sit on the tube of the boat. He similarly should have known that it was not safe to change positions in the boat while the boat was accelerating.

Nevertheless, if Doyle were sitting on the tube, Graske's duty of reasonable care for passenger safety would have correspondingly increased in proportion to the increased danger to the passenger.  Thus, Graske would have an even higher duty to a passenger sitting on the inflatable tube portion of the boat while the boat is operating at plane speeds. Any criticism that can be leveled at Daniel Doyle for either sitting on the tube or failing to hold a strap, can also be leveled at Graske for accelerating in the face of such conduct. If Doyle's conduct on the boat was unsafe, then it would be unsafe for boat's operator to continue to allow the conduct and to operate the boat in a fashion that jeopardizes the passenger's safety.

Although Mr. MacNeill's measurements are valuable to the court's analysis, the court is not inclined to credit his testimony on safety issues.  Mr. MacNeill's essential expertise is in designing yachts, not small recreational boats shorter than twenty feet. MacNeill is also imbued with the laissez-faire safety attitude of most manufacturers. Although he repeatedly recognized the boat operator's duty to safely operate the boat, he was quick to point out the passenger's responsibility to act safely, failing to appreciate that contributory negligence is not a complete defense under admiralty law.  Significantly, MacNeill also admitted that anyone seated in the bow of the boat who was not holding the hand straps would have been ejected if there were a sudden turn.  The court credits Mr. Larson's opinion that a passenger holding the hand straps would not be able to react quickly enough to prevent his ejection from the boat.  Mr. Van Hook testified that he was surprised at how quickly the plaintiff was ejected from the boat.  Were it not for his position at, or aft of, the boat's pivot point, it is likely Van Hook would have suffered the same fate.

The plaintiffs' assertion that the defendant should have inspected the steering linkage to the engine prior to operating the boat is not supported by the credible evidence.

The plaintiffs' expert witnesses' expressed opinion that an inspection of the steering linkage at the engine would have been a safe thing to do is irrefutable. However, there is no evidence to support the court's imposition of a duty on a boat operator to examine this linkage before each excursion. The safety and regulatory materials received by the court support a duty only to make sure the steering is operational. On Graske's boat, operating the steering wheel prior to starting the excursion fulfills that requirement. There is no evidence that the steering mechanism was not functional prior to the instant catastrophic failure. The boat was operated from its mooring to shore and then from shore through the no wake zone and then some distance further. It is reasonable to assume the steering mechanism was operational until the drag arm became disengaged from the steering cable extension. That event occurred while the engine was being trimmed. Trimming the engine requires tilting it to gain effective propeller purchase with the water in order to maintain plane and efficient operation.

Because the above analysis is dispositive, the court need not address the plaintiffs' other allegations of negligence.[15]

The evidence adduced in this case also establishes that other parties also owed duties to the plaintiff. The manufacturer of the boat would have had a duty to warn a purchaser, operator, or occupant of the boat that bow seating would not be safe at planing speeds or that seating on the inflatable tubes should not be allowed during operation at planing speeds. Accordingly, it appears that the manufacturer may have some liability for failure to warn that no one should be in the bow section of the boat or on the inflatable tubes when the boat operated at a speed sufficient to keep it on plane. Similarly, the

---

[15]The plaintiffs' claims that Graske was negligent in failing to maintain a seaworthy vessel, failing to require a life jacket, and failing to keep the boat in safe operating condition were dismissed a the close of plaintiffs' case-in-chief for the reasons stated on the record.

mechanic who repaired the steering mechanism had a duty to repair it properly.   The evidence establishes that a reasonably competent mechanic would have known that a used nylock nut should have been replaced with a new nylock nut and not reinstalled.   The mechanic's employer had a duty to properly supervise the mechanic's work and to ensure that new nylock nuts were installed when replacing such nuts during repairs, especially on critical mechanisms such as steering.   The medical providers involved in Doyle's care all had a duty to provide standard medical care.   There is no evidence in this case, however, that the care provided by any of the health care providers was substandard.   Although Dr. Stothert expressed the opinion that he would have placed Doyle on a ventilator at the outset of his hospitalization, there is no evidence that any failure to do so violated the standard of care of a reasonable medical professional.   Stothert testified that he did not have sufficient records to come to such a conclusion.   The extent to which these duties were breached by other parties cannot be determined by the court since the court does not have jurisdiction over them.

## 2.    Causation

There is no sole proximate cause in this case.   The issue of an intervening, superseding cause has already been addressed in the court's earlier order.   *See* Filing No. 276.   The evidence at trial shows that an unbroken chain of events connects the boat accident to Doyle's anoxic brain injury.   Substandard medical care generally does not break the chain of causation even if the care adds to the damages.[16]   Throughout Doyle's hospital care in the Cayman Islands, at the time of his air ambulance transfer, and in the Florida hospitalization, Doyle had oxygenation problems.   He would not have had this

---

[16] It is questionable that medical negligence is even cognizable in the Grand Cayman Islands.

condition were it not for suffering from a flail chest caused by the fracture of all his posterior ribs in the boating accident.

The evidence shows that the accident would not have occurred absent the failure of the boat's steering mechanism, which was allegedly due to the mechanic's negligence. A sudden mechanical failure, however, is not an unforeseeable event. It is the duty of an owner and operator of a vessel to operate the boat safely in the event of such an occurrence. Assuring that passengers are properly seated in a small boat accelerating on the open ocean is fundamental to that duty. The failure of Graske to exercise reasonable care under the circumstances in the operation of his boat by accelerating while a passenger was in a position of peril caused Doyle to fall overboard in the sudden turn.

As to the defendant's assertion that the failed steering mechanism is the sole cause of the accident, the court notes that even the defendant recognized that an emergency turn is necessary when swimmers suddenly appear from beneath the water. No doubt the defendant will concede that any number of hazards that require a hard turn can occur. In that event the bow passenger will be ejected from the boat. Thus, every boating manual received by the court in this case notes the requirement that passengers should not sit on the side of the boat while it is underway. Accordingly, the court finds that the negligence of defendant Graske in the operation of the boat was a proximate and substantial cause of Daniel Doyle's injuries.

The court must next determine whether the plaintiff's own negligence also contributed to the injury and the proportionate share of the damages attributable to the plaintiff vis-a-vis defendant Graske. Given the size and power of this boat, even plaintiffs' expert expressed the opinion that anyone in the bow of this boat would be ejected in a sharp turn, and that anyone in the boat would be able to appreciate the danger of not

holding on to the hand straps when the boat was at planing speed.  The evidence shows that Doyle knew or should have known that it was unsafe to sit on the gunnel or tube of the boat while it was underway.  Doyle violated a passenger's duty to use reasonable care for his own safety.

Doyle's comparative negligence mitigates the damages attributable to Graske to some extent.  However, the court finds that, because, as the operator of the boat, Graske has a higher duty of care than his passenger, Graske remains responsible for a substantial portion of the damages.

Because there are no other party defendants to this action, the court cannot determine the extent to which the alleged negligence of other tortfeasors contributed to the Doyle's injuries, nor can it determine the proportion of the damages that should be allocated to each of those parties.  Given the totality of negligence supported by the record in this case, the court finds that the plaintiff Daniel Doyle can be held accountable for no more than 10% of the total liability.  The evidence indicates that the greatest share of the responsibility for the negligence in this case rests with the boat mechanic and his employer for improperly repairing the steering mechanism and for reusing a nylock nut.  There may also be a claim against the manufacturer for failing to warn of the dangers to bow and gunnel riding passengers of this 14-foot boat.  However, these later mentioned parties are not part of the case presented to this court and subject to its jurisdiction.  Consequently, the court will leave it to the courts that do have jurisdiction over these matters to sort out any contribution or indemnification issues between the defendant and the aforementioned potential tortfeasors.  Accordingly, with respect to the overall liability of all potential tortfeasors for the injuries Doyle sustained in the boating accident, the court apportions damages as follows:  10% to the plaintiff, Daniel Doyle, 90% to the defendant, Leland

Graske, and the other potential tortfeasors.   Plaintiff Daniel Doyle's recovery should accordingly be reduced by 10%.

### 3.    Damages

The parties have stipulated that plaintiff Daniel Doyle incurred medical bills in the amount of $252,517.  The court credits the testimony of Dr. Scarborough that Daniel Doyle's lost wages up to November 1, 2007, amount to $269,112. The evidence shows that, had he not been injured, Doyle would have worked until his full retirement age, or to age 66.  The court further finds that the present value of Doyle's future lost wages until retirement is $790,646, resulting in damages for past and future lost wages in the amount of $1,059,758.

The court finds that Doyle will incur certain medical expenses in the future as a result of his injuries.  The court finds, however, that there is no reasonable likelihood that physical or occupational therapy for Doyle would be effective or necessary in the future. The evidence supports a one-time award of $400 for equipment such as a cane, shower grab bars, and a shower bench.

The evidence also shows that Doyle will need round-the-clock care by a personal attendant for the rest of his life or until he may need care in a residential facility as part of his normal aging process.  The option for the supportive care of a live-in caregiver would best suit Daniel Doyle's needs and conditions.  The evidence shows that Doyle needs round-the-clock care.  The court credits Dr. Burke's testimony that such care, furnished by a personal care assistant, along with case management, room and board, transportation, and allowances for the costs of housecleaning, home maintenance, physician's care, and medication could be obtained for approximately $58,907 per year in today's dollars,

resulting in the present value of total damages for Doyle's future medical and supportive care in the amount of $1,285,272.

Provision of the cost of live-in care will adequately account for the services of plaintiff's wife for any part she continues to play in Daniel Doyle's care.  Mrs. Doyle's willingness to care for her husband is commendable, but she is not required to do so.  If Anne Doyle were not available to care for Daniel Doyle, the services of a personal care attendant would be required.  Accordingly, Mrs. Doyle's services should be calculated at the same rate as a personal care attendant.  If Daniel Doyle should need to be admitted to an assisted-living or long-term care as he ages, he will have been compensated for his lost wages and can pay for assisted living the same as any other individual, but will have the balance of the damage award to pay for any additional supportive care that he will reasonably require as a result of his injuries.  In view of the foregoing, the court finds that a special damages award of $2,597,947 to plaintiff Daniel Doyle will adequately compensate him for the injuries he has suffered in this case.  This award includes his past and future lost wages, medical expenses–past and future–and the cost of his future supportive care.

The evidence also supports a substantial award of compensatory damages to Daniel Doyle for pain and suffering and loss of enjoyment of life and to Anne Doyle for loss of consortium.  Testimony at trial shows that both Daniel and Anne Doyle have suffered an incalculable loss.  Daniel Doyle has substantial physical and mental disabilities.  The evidence shows that Daniel Doyle has enough awareness of his condition to appreciate his predicament.  His injuries have left him depressed, lacking in motivation, and incapble of exercising proper judgment.  He comprehends the fact that he is no longer the person he once was, but is powerless to change his situation.

As a result of Daniel Doyle's injury, Anne Doyle has essentially lost the companionship of the person she once knew. The course of her life, as well as Daniel Doyle's, was irreversibly altered by the accident. She has become a full-time caregiver for a person who is no longer the person she married. The court finds that she should be compensated for this intangible loss at a level close to that of her husband. Accordingly, the court finds that a general damages award for pain, suffering and loss of life's enjoyment in the amount of $1,000,000 is appropriate for Daniel Doyle and a general damages award of $750,000 is appropriate for Anne Doyle's loss of consortium.

Because the court finds comparative negligence by Daniel Doyle that operates to mitigate defendant Graske's liability, Daniel Doyle's total award of $3,597,947 must be reduced by 10%, or $359,794, resulting in a total damages award of $3,238,153 to Daniel Doyle. Anne Doyle's damages are not subject to any reduction. Accordingly, in conformity with this opinion, a judgment in the amount of $3,238,153 will be entered in favor of plaintiff Daniel Doyle, and a judgment in the amount of $750,000 will be entered in favor of plaintiff Anne Doyle and against defendant Leland Graske, together with taxable court costs.

DATED this 10th day of June, 2008.

BY THE COURT:


s/ Joseph F. Bataillon
Chief United States District Judge